EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re:<br><br><br>Roberto Sueiro del Valle | 2016 TSPR 9<br><br>194 DPR \_\_\_\_ |

Número del Caso: AB-2005-130


Fecha: 15 de enero de 2016

Abogado del Promovido:

      Por derecho propio

Abogado del Promovente:

      Por derecho propio


Oficina del Procurador General:

      Lcdo. Salvador J. Antonetti Stutts
      Procuradora General

      Lcda. Sarah Y. Rosado Morales
      Procuradora General Auxiliar

Materia: Resolución con Votos Particulares de Conformidad

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re*

Roberto Sueiro del Valle                    AB-2005-130


RESOLUCIÓN

San Juan, Puerto Rico, a 15 de enero de 2016

Examinada la "*Queja*" presentada por el Sr. Emmanuel Logroño y la "*Contestación a Queja y Comparecencia*" presentada por el Lcdo. Roberto Sueiro del Valle, se ordena el archivo de la queja.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez emitió un Voto Particular de Conformidad al que se une el Juez Asociado señor Estrella Martínez. El Juez Asociado señor Martínez Torres emitió un Voto Particular de Conformidad. La Jueza Asociada Oronoz Rodríguez inhibida.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| *In re* | | |
| Roberto Sueiro del Valle | AB-2005-130 | |

Voto Particular de Conformidad emitido por la Juez Asociada señora Rodríguez Rodríguez al que se une el Juez Asociado señor Estrella Martínez

San Juan, Puerto Rico, a 15 de enero de 2016

Por entender que la queja presentada contra el Lcdo. Roberto Sueiro del Valle ameritaba que este Tribunal se expresara sobre la constitucionalidad del Canon 14 del Código de Ética Profesional, el cual incide en el derecho a la libre expresión de los abogados en nuestra jurisdicción, suscribo este voto particular de conformidad.

**I**

El licenciado Sueiro del Valle fue admitido al ejercicio de la abogacía el 5 de enero de 1988 y al ejercicio de la notaría el 27 de abril de 1990. El 9 de junio de 2005, el Sr. Emmanuel Logroño Molina (querellante) presentó una queja contra el licenciado Sueiro del Valle, alegando, en lo pertinente, que éste había incurrido en conducta antiética al emitir unas expresiones públicas impropias relacionadas con el querellante. Esto, mientras se ventilaba un pleito civil en el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico, en el cual el licenciado Sueiro del Valle representaba a una de las

partes y el querellante figuraba como demandado.[1] Así, se le imputó al licenciado Sueiro del Valle haber contravenido el Canon 14 de Ética Profesional. Cód. Ética Profesional, 4 L.P.R.A. Ap. IX, C. 14.

Antes de entrar a dilucidar las cuestiones propiamente éticas, conviene repasar someramente los hechos que suscitan la queja presentada por el señor Logroño Molina.

## II

TMTV Corp. (TMTV), compareciendo a través de su presidente –el Sr. Antonio "Tony" Mojena Zapico-, demandó en el foro federal a Mass Productions, Inc., corporación del señor Logroño Molina. El licenciado Sueiro del Valle representó a TMTV en ese pleito. El mismo, en esencia, versaba sobre la titularidad de los derechos de autor de la serie televisiva "20 Pisos de Historia". Se alegaba, pues, que la serie televisiva "El Condominio" –producida por el señor Logroño Molina- infringía los derechos de autor de TMTV, puesto que era una apropiación indebida del concepto original de "20 Pisos de Historia".

Luego de los trámites de rigor, el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico

---

[1] Véase *TMTV, Corp. v. Mass Prods., Inc.* (*TMTV I*), 345 F.Supp.2d 196 (D.P.R. 2004) (dictando sentencia sumaria parcial a favor de los demandantes y determinando que, en efecto, éstos eran los únicos titulares de los derechos de autor de los programas televisivos objeto de controversia). Véase, además, *TMTV Corp. v. Mass Productions, Inc.*, 645 F.3d 464 (1st Cir. 2011); *TMTV, Corp. v. Mass Productions, Inc.*, 853 F.Supp.2d 208 (D.P.R. 2012); *TMTV, Corp. v. Mass Prods., Inc.* (*TMTV II*), 453 F.Supp.2d 378 (D.P.R. 2006).

emitió una sentencia sumaria parcial en la que adjudicó la titularidad de los derechos concernidos a favor del demandante, TMTV. Asimismo, determinó que, en efecto, los demandados, mediante el programa "El Condominio", infringieron dichos derechos, en la medida en que ese programa era un derivado de "20 Pisos de Historia". Véase *TMTV I*, 345 F.Supp.2d en la pág. 214.

Así las cosas, *luego de emitida la sentencia sumaria parcial por el foro federal*, el señor Logroño Molina alegó que el licenciado Sueiro del Valle fue entrevistado en el programa televisivo *Súper Xclusivo*, en el que, a preguntas del señor Leo Fernández, emitió las siguientes declaraciones:

> *Sr. Fernández*: ¿Se puede considerar injusta la sentencia para Sunshine [señor Logroño Medina] toda vez que el público le tiene mucho cariño a Sunshine y el hecho de que [en] la sentencia se reclame una cantidad millonaria y que pudiera también afectar la transmisión del programa El Condominio?

> *Lcdo. Sueiro del Valle*: Yo creo que no, y creo que el tribunal así lo afirma en la sentencia, cuando tengas la oportunidad de leerla [sic]. Yo entiendo que Sunshine lo que hizo en este caso fue que se robó el programa de Tony Mojena y se lo llevó al canal 4. Yo entiendo que va mucho más allá de eso y Tony Mojena en su momento determinado habrá de hablar de eso. Y no te estoy hablando del plano jurídico, te estoy hablando ahora en el plano personal. Como todos ustedes saben, Sunshine en un momento determinado no estaba haciendo nada en la televisión y quien le dio la oportunidad fue Tony Mojena. Tony Mojena paga por todas estas cuestiones de "El Condominio", perdóname de "20 Pisos de Historia", que después se termina en lo que hoy conocemos como "El Condominio". Sabiendo esto Sunshine, a Sunshine [sic] se le enviaron unas notificaciones, se le hicieron unas

advertencias, se le dio la oportunidad de transar, que en un momento determinado a Sunshine se le dijo única y exclusivamente, mira con que tú retires X y Y personajes de la historia dejamos que tú sigas con "El Condominio" y que se negó, o sea, se le dieron más oportunidades [sic]. Antes del tribunal emitir una sentencia se citó para una vista transaccional, las cuales ellos denegaron y con soberbia dijeron que no les importaba hablar de transacción y en un momento determinado Sunshine nunca se reunió con Tony Mojena para ver si llegaban a un acuerdo transaccional. Quien tuvo la decencia de hacerlo fue Joe Ramos en un momento determinado. Por eso yo entiendo que esta sentencia no es injusta para él porque aunque él está creando un taller, y yo sé que para muchos puertorriqueños, en cuanto a programas de televisión respecta, este taller que se creó es uno ilegítimo desde el momento en que él se llevó un programa que no le pertenecía.

De igual manera, el señor Logroño Molina, en su queja, indicó que, a principios de diciembre de 2004, el licenciado Sueiro del Valle participó en el programa televisivo *Dame un Break*, donde, a su vez, realizó las siguientes expresiones:

*Entrevistador*: [. . .] ¿[o]tros [sic] personas, qué pasa con los que han entrado a lo que es la trama del concepto original?

*Lcdo. Sueiro del Valle*: Los personajes que se crean dentro de un concepto que ya le pertenece al concepto original y que se determinó que era de otra persona, no tiene[n] legalidad jurídica[,] por decirlo así. Te lo voy a decir con un ejemplo. Si Tony Mojena tiene un carro y viene una persona y se lo roba y esa persona le coloca asientos, gomas, aros, le modifica el motor, lo pinta, [y] al cabo del tiempo viene la policía, la incauta, interviene con la persona que se lo robó y luego se determina que le pertenece a Tony Mojena, Tony Mojena es dueño del carro entero, de las gomas, modificaciones. Esto ocurre con los personajes. Al que se tiene que

> responsabilizar es a Sunshine [señor Logroño Molina] que sabía que se estaba llevando un concepto que le pertenecía a otra persona y el riesgo se lo tomó él de que esos personajes y esos nuevos personajes [sic] y conceptos que estaba añadiendo a un trabajo derivado, que no era ningún trabajo derivado, que era exactamente lo mismo [sic], eso eventualmente le iba a pertenecer a Tony Mojena.

El señor Logroño Molina arguyó, pues, que ambas expresiones atentaron contra su honra y dignidad, en la medida en que lo caracterizaban como "ladrón". Por tanto, arguyó que las mismas debían ser censuradas por este Tribunal, puesto que, además, contravenían las normas éticas de la abogacía, en particular, el Canon 14 del Código de Ética Profesional. Señaló, también, que el licenciado Sueiro del Valle estaba impedido de hacer expresiones públicas en torno a un caso *sub judice*.

El 5 de julio de 2005, el licenciado Sueiro del Valle presentó su contestación a la queja. En ésta, alegó que la sentencia sumaria parcial emitida por el foro federal, en efecto, establecía que su cliente en dicho pleito era el único titular de los derechos de autor concernidos y, además, que el programa televisivo "El Condominio" infringía dichos derechos. De otra parte, señaló que sus expresiones en los medios de comunicación estuvieron dirigidas a defender la reputación de su cliente, toda vez que el caso en el foro federal fue discutido ampliamente en la prensa del País. Además, añadió que coartar su derecho a expresarse, en las circunstancias particulares del caso,

bien podría atentar contra la función social de la abogacía o, en cualquier caso, podría infringir su derecho constitucional a la libre expresión.

En cuanto a las contenciones del señor Logroño Molina de que las expresiones hechas por el licenciado Sueiro del Valle ultrajaban su honra y su dignidad, el letrado se limitó a señalar que la palabra "robo" -y la posible caracterización como "ladrón"- fue utilizada como sinónimo de "usurpar" e "infringir". Es decir, no fue utilizada en su acepción jurídica. Ello, según alega el licenciado Sueiro del Valle, responde a que sus expresiones en los medios de comunicación fueron hechas para proteger a su cliente, así como para explicarles a personas legas la compleja controversia ventilada -y adjudicada, en lo esencial- en el foro federal.

El señor Logroño Molina, por su parte, presentó un escrito en respuesta a la contestación del licenciado Sueiro del Valle. En éste, reiteró lo aseverado en su queja y, además, alegó que TMTV, a través de sus representantes, fue quien procuró que los medios noticiosos publicaran información relacionada al litigio. Una vez más, reiteró que las expresiones del licenciado Sueiro del Valle tildándolo de "ladrón" mancillaron su buen nombre, su honra y su dignidad.

El 9 de agosto de 2005, le referimos la queja en cuestión al Procurador General, para que éste diera curso a la investigación de rigor y emitiera el informe correspondiente. El 17 de octubre de 2005, el Procurador

General presentó su informe, en el cual señaló, en síntesis, que la conducta imputada no violaba el Canon 14, dado que las expresiones hechas por el licenciado Sueiro del Valle, analizadas en conjunto, estaban protegidas por el derecho a la libertad de expresión, según consagrado en la Constitución de Estados Unidos y la Constitución del Estado Libre Asociado de Puerto Rico.

El 12 de diciembre de 2006, este Tribunal emitió una orden dirigida al licenciado Sueiro del Valle para que mostrara causa por la cual no debía ser disciplinado a la luz del Canon 14 de Ética Profesional. El licenciado Sueiro del Valle compareció oportunamente y señaló, entre otras cosas, que las expresiones hechas estaban protegidas por el derecho a la libre expresión, según consagrado en la Constitución federal y en la Constitución del Estado Libre Asociado de Puerto Rico. Además, *impugnó la constitucionalidad del Canon 14 aludiendo a las doctrinas de vaguedad y amplitud excesiva*. En la alternativa, arguyó que sus expresiones no estaban prohibidas por dicho canon, debido a que no fueron hechas para influenciar indebidamente las incidencias de un pleito judicial pendiente, sino para proteger los intereses legítimos de su cliente.

En lo atinente a las protecciones constitucionales, el licenciado Sueiro del Valle alegó que, según lo resuelto por el Tribunal Supremo de los Estados Unidos en *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991), un abogado puede hacer expresiones sobre un pleito pendiente, siempre

y cuando sus manifestaciones no tengan posibilidad de ocasionar un perjuicio sustancial. Así, adujo que el Canon 14, dada su redacción, no se ajustaba al estándar establecido por el Tribunal Supremo federal en *Gentile*.[2] Por tanto, el licenciado Sueiro del Valle solicitó que declaráramos dicho canon inconstitucional. En la alternativa, arguyó, como se dijo, que sus expresiones no contravenían el canon en cuestión, toda vez que fueron hechas para velar por los intereses de su cliente.

El 21 de febrero de 2007, el señor Logroño Molina compareció nuevamente ante este Tribunal y reiteró su postura. Argumentó, por tanto, que el Canon 14 no era inconstitucional y que, en atención a las particularidades fácticas del caso, el pleito federal no constituía un "caso extremo".

Habiendo repasado los pormenores fácticos, procede evaluar la constitucionalidad del Canon 14 a la luz de las disposiciones constitucionales pertinentes y su jurisprudencia interpretativa. Es decir, nos corresponde conciliar, en lo posible, nuestro Canon 14 con lo resuelto

---

[2] El licenciado Sueiro del Valle señala que el Canon 14 contiene una prohibición casi absoluta, puesto que sólo reconoce como legítimas —esto es, protegidas— las expresiones que haga un abogado en "casos extremos", aun cuando las expresiones pudieran no tener la posibilidad de ocasionar un perjuicio sustancial en determinado procedimiento adjudicativo. De igual forma, señala que dicho canon exhorta a que los abogados, incluso en "casos extremos", se abstengan de hacer comentarios, lo cual puede interferir indebidamente con su derecho constitucional a la libertad de expresión.

por el Tribunal Supremo federal en *Gentile*.[3] Para ello, pues, será preciso repasar los contornos normativos del Canon 14 y, luego, examinar la doctrina constitucional pertinente.

## III

El Canon 14 de Ética Profesional regula el intrincado asunto de la publicidad, a instancias de un abogado, en pleitos civiles pendientes de adjudicación.[4] Es decir, establece el margen de libertad que tiene un abogado para

---

[3] Como se sabe, las interpretaciones suscritas por el Tribunal Supremo de EEUU en lo atinente a la Constitución federal constituyen el ámbito mínimo que este Tribunal está obligado a respetar al interpretar cláusulas análogas de nuestra Constitución, como, por ejemplo, aquella que consagra el derecho fundamental a la libertad de expresión. Véase, por ejemplo, *Pueblo v. Díaz, Bonano*, 176 D.P.R. 601, 621-22 (2009); *Díaz v. Col. Nuestra Sra. del Pilar*, 123 D.P.R. 765, 770 (1989); Raúl Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico* 1711, Vol. II (1988). Véase, además, José Julián Álvarez González, *Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos. Casos y materiales*, pág. 75 (2010) ("[E]n función de la cláusula federal de supremacía . . . la extensión *mínima* de los derechos constitucionales puertorriqueños que tienen contraparte en la Constitución federal está delimitada por las interpretaciones que sobre ésta haya emitido el Tribunal Supremo federal".). Valga señalar que en *Gentile* el Tribunal Supremo federal se expresó sobre el ámbito de protección constitucional que tiene un abogado al emitir expresiones públicas relacionadas a un proceso judicial pendiente, si bien se trataba de un caso de índole criminal. En cualquier caso, es menester precisar el alcance de lo resuelto en *Gentile* –dada su evidente pertinencia a la controversia que nos ocupa- con tal de identificar el ámbito mínimo de protección que ha de tener un abogado al expresarse sobre alguna materia relacionada a un proceso adjudicativo pendiente.

[4] *Cf.* Cód. Ética Profesional, 4 L.P.R.A. Ap. IX, C. 13 (el cual regula la publicidad y la libertad de expresión de los abogados en pleitos criminales pendientes).

comentar los pleitos en los cuales interviene, cuando éstos aún no han sido adjudicados en propiedad. Dicho canon dispone que

> [e]l abogado debe abstenerse de publicar o de cualquier manera facilitar la publicación en periódicos o a través de otros medios informativos, detalles u opiniones sobre pleitos pendientes o que señalen la probabilidad de litigios futuros, pues tales publicaciones pueden obstaculizar la celebración de un juicio imparcial y perjudicar la debida administración de la justicia. En caso de que las circunstancias extremas de un pleito específico justifiquen ofrecer una información al público, será impropio el hacerlo anónimamente. Una referencia unilateral o *ex parte* a los hechos de un caso debe limitarse a citas tomadas de los récords y documentos archivados en los tribunales; pero aun en estos casos extremos, es preferible abstenerse de ofrecer tales declaraciones.

Cód. Ética Profesional, 4 L.P.R.A. Ap. IX, C. 14.

De entrada, es menester señalar que "[l]a comunicación violatoria de este canon requiere que la expresión del abogado se comunique al público y que verse sobre un pleito pendiente, no sobre uno en el que se haya emitido una sentencia que sea final y firme". Sigfrido Steidel Figueroa, *Ética y responsabilidad disciplinaria del abogado* 213 (2010). Véase *In re Nogueras Cartagena,* 150 D.P.R. 667, 680 (2000) (resolviendo que para que proceda una querella ética por infringir el Canon 14 es preciso que se establezca que las expresiones hechas por el abogado, en efecto, se publicaron). Así, el Canon 14 pretende, ante todo, evitar que los abogados ejerzan presiones indebidas en los medios de comunicación

tendentes a influenciar impropiamente las decisiones judiciales o procedimientos adjudicativos, en la medida en que éstos han de ceñirse a la prueba admisible y a las normas de Derecho pertinentes. Steidel Figueroa, *supra*, pág. 213.[5]

Dicho lo anterior en cuanto a las consideraciones de política pública -y judicial- que inspiran el canon en cuestión, conviene precisar sus distintos ámbitos normativos. Esto es, especificar qué prohíbe el canon y cuándo.

En primer lugar, el canon consagra palmariamente un deber general de abstención relacionado con la publicación de "detalles u opiniones sobre pleitos pendientes". Esto, en la medida en que se podría afectar la celebración de un juicio imparcial y perjudicar la sana administración de la justicia. De esta forma, pues, se subordina la libertad de expresión del abogado -en tanto oficial de la corte- a los intereses de mayor jerarquía que informan la labor de los tribunales. Es menester enfatizar, también, que dicho deber general de abstención es relativo, dado que se

---

[5] Valga señalar que el deber ético consagrado en el Canon 14 adquiere mayor importancia en casos que se ventilan ante Jurado, dado que éste está compuesto, como norma general, por personas legas. Sin embargo, como se sabe, en nuestra jurisdicción no se ventilan pleitos civiles ante Jurado. No obstante, conviene no perder de vista esta distinción, puesto que la conducta de un abogado -admitido al ejercicio de la abogacía en el Estado Libre Asociado de Puerto Rico- en jurisdicciones en las que sí se permiten pleitos civiles ante Jurado bien podría ser éticamente reprochable y, en consecuencia, sancionada por este Tribunal. Véase, por ejemplo, *In re Scott*, 175 D.P.R. 474 (2009); *In re Rochet Santoro*, 174 D.P.R. 123 (2008).

condiciona el límite que supone a los posibles efectos perjudiciales que determinada expresión de un abogado pudiere causar en un pleito pendiente.

Cabe señalar, sin embargo, que la redacción de esta primera oración del canon es un tanto confusa. Por ejemplo, bien pudiera entenderse que, ante la mera posibilidad de que las expresiones de un abogado perjudiquen o mancillen la imparcialidad de un juicio, el deber de abstención señalado opere con independencia del probable efecto de las expresiones que el abogado profiera. Es decir, que el abogado viene obligado a abstenerse aun cuando sus expresiones no tiendan a "obstaculizar la celebración de un juicio imparcial y perjudicar la debida administración de la justicia". 4 L.P.R.A. Ap. IX, C. 14. Tal lectura, empero, supondría restringir injustificadamente la libertad de expresión de los abogados. Ello, en la medida en que dicha restricción no daría cuenta de las consideraciones de interés público que han de informar cualquier regulación a la expresión de la clase togada. Por ende, descartamos esa posibilidad. En cambio, entendemos que la conjunción "*pues*", en la primera oración del canon, "[d]enota causa, motivo o razón", Real Academia Española, *Diccionario de la lengua española* 1080 (22ma ed. 2010), http://lema.rae.es/drae/?val=pues. En consecuencia, la posible obstaculización a la celebración de un juicio imparcial, así como el probable efecto perjudicial a la debida administración de la justicia, han de ser la "causa, motivo o razón" en virtud de la cual

opere el deber de abstención identificado. Así, éste limita las expresiones de un abogado cuando éstas tiendan a menoscabar los intereses públicos que tutela la restricción, según interpretada por este Tribunal.

De otra parte, en su segunda oración, el canon hace referencia a "circunstancias extremas" que podrán justificar que el abogado emita ciertas expresiones públicas, si bien será impropio que lo haga anónimamente. Dispone el canon, también, en su tercera oración, que cualquier referencia "unilateral o *ex parte*" a los hechos del caso deberá limitarse a citas de los récords y documentos que obren en los archivos del tribunal. Por último, el canon, en esa misma oración, exhorta a los abogados a que, aún en esos "casos extremos", se abstengan de ofrecer declaración alguna. Ello parece indicar que como norma general, el abogado deberá abstenerse de emitir expresiones públicas, aun cuando éstas pudieran no afectar o incidir en la imparcialidad del pleito judicial pendiente. Es decir, cabría pensar, entonces, que la censura a las expresiones del abogado, *salvo en casos extremos*, es un fin en sí mismo, y no un mecanismo para tutelar intereses legítimos del Estado como, por ejemplo, la imparcialidad de los procesos adjudicativos en el País.

Se percibe, pues, cierta tensión entre uno y otro aspecto del canon que nos ocupa. Por un lado, el canon establece, primero, un deber general de abstención, el cual, como se dijo, supone una limitación relativa, subordinada al legítimo interés del Estado en procurar que

los procesos judiciales se lleven a cabo de manera imparcial y de propender a la sana administración de la justicia. Así, pues, parecería ser que cualquier otra expresión que no amenace con causar algún perjuicio sustancial en un proceso judicial pendiente será válida.

Por otro lado, sin embargo, el canon dispone, sin especificar cuáles son, que las declaraciones públicas que emita un abogado sólo serán aceptables en ciertas "circunstancias extremas", con independencia del efecto que éstas tengan sobre la integridad del proceso judicial al que se refieren. Es decir, puesto que se subordina la justificación de las expresiones a las "circunstancias extremas", todo parecería indicar que, como regla general, el abogado estará impedido de hacer declaraciones al público, aun cuando éstas no tuvieren la probabilidad de afectar sustancialmente la imparcialidad de determinado pleito pendiente o atentar contra la eficiente administración de la justicia. Tal apreciación, además, se ve reforzada por la exhortación que consagra el canon: "aun en estos casos extremos, es preferible abstenerse de ofrecer tales declaraciones". Nótese, una vez más, cómo el canon guarda silencio en torno a cuáles son los casos extremos en los que será preferible abstenerse de emitir declaraciones. Asimismo, el canon tampoco provee criterios que permitan determinar qué constituye un caso extremo, ni cuándo es aceptable determinar que las circunstancias son extremas y justifican el ejercicio de la libertad de expresión por parte del abogado. La exigua jurisprudencia

de este Tribunal sobre el particular no ha remediado la insuficiencia del canon.[6] De otra parte, este Tribunal no ha tenido oportunidad de dirimir satisfactoriamente la tensión señalada.

## IV

No fue hasta 1990 cuando este Tribunal, por primera vez, aludió al canon que nos ocupa, en *In re Secretario de Justicia*, 126 D.P.R. 463 (1990). En aquella ocasión, el asunto versaba sobre unas expresiones hechas por el entonces Secretario de Justicia, Lcdo. Héctor Rivera Cruz, mientras fungía como gobernador interino, relacionadas con las actuaciones del Juez federal José A. Fusté en el caso *Cordero v. De Jesús Méndez*, 867 F.2d 1 (1er Cir. 1989), que se ventilaba en el foro federal. Sin embargo, por

---

[6] Tal insuficiencia es de particular importancia debido a los intereses constitucionales concernidos. No se debe perder de vista que nuestro Código de Ética Profesional data de 1970. Por tanto, es evidente que le compete a este Tribunal, al amparo de su poder inherente para reglamentar la profesión legal, atemperar los cánones de conducta profesional a las exigencias que imponga el devenir de la doctrina constitucional, con tal de mitigar cualquier insuficiencia normativa. Véase, por ejemplo, Álvarez González, *supra*, págs. 1057-61; Luis M. Villaronga, *Derecho Constitucional*, 64 Rev. Jur. U.P.R. 765, 795-96 (1995). Ello, en aras de evitar que nuestros preceptos éticos se tornen obsoletos. Maricarmen Ramos de Szendrey, *Responsabilidad Profesional*, 61 Rev. Jur. U.P.R. 961, 966-67 (1992) ("[L]a obsolescencia, inclusive de índole constitucional, que adolece nuestro Código de Ética Profesional apunta a la necesidad imperiosa de que se efectúe una reestructuración de todo lo concerniente al ordenamiento disciplinario en sus aspectos procesales y sustanciales. Es al Tribunal Supremo en primera instancia, en virtud de su facultad inherente para reglamentar todo lo concerniente a la abogacía, . . ., a quien[] [le] corresponde esta inaplazable tarea".) (citas omitidas).

tratarse del Secretario de Justicia, este Tribunal no atendió la presunta infracción al Canon 14. En vez, optó por atender, como cuestión de umbral, las consideraciones que informan el ejercicio de la jurisdicción disciplinaria en el contexto de la doctrina de separación de poderes, puesto que el querellado emitió sus expresiones mientras se desempeñaba como funcionario público en la Rama Ejecutiva. *In re Secretario de Justicia*, 126 D.P.R. en la pág. 466. De esta forma, pues, reiteramos la doctrina de abstención que habíamos articulado en *In re Secretario de Justicia*, 118 D.P.R. 827, 850 (1987), según la cual este Tribunal se abstendrá de sancionar disciplinariamente a un funcionario público de la Rama Legislativa o Ejecutiva cuando

> (1) el promovente no justifique satisfactoriamente un interés legítimo ético y perjuicio real directo; (2) el asunto, aunque de carácter ético, sea prematuro; (3) los hechos no estén debidamente documentados o sustanciados, o (4) no sean materia ético-adjudicable por corresponder propiamente al debate del Poder Legislativo o Ejecutivo, o pertenecer a la arena de la política partidista.

*Id.*

De esta forma, por tanto, este Tribunal no tuvo que atender la alegada violación al Canon 14, puesto que entendió que, en efecto, las expresiones objeto de controversia fueron emitidas por el licenciado Rivera Cruz no como abogado, sino en calidad de gobernador interino.

En consecuencia, se archivó la queja presentada por el Juez Fusté.

Como se ve, la primera invocación jurisprudencial del canon, dadas las particularidades del caso, no permitió que este Tribunal entrara a dilucidar sus contornos normativos, con tal de arrojar luz sobre cómo éste habría de operar.

En cambio, en *In re Clavell Ruiz*, 131 D.P.R. 500 (1992), este Tribunal tuvo la oportunidad de enfrentarse, si bien someramente, a la norma consagrada en el Canon 14. En aquel entonces, se resolvió que el licenciado Clavell Ruiz infringió el Canon 14 al radicar reiteradamente querellas y promover investigaciones inmeritorias. En lo que respecta a la norma que contiene el canon, nos limitamos a señalar que

> [e]n protección de la debida administración de la justicia y para evitar la obstaculización de procesos judiciales imparciales, todo abogado debe abstenerse de facilitar de cualquier forma la publicidad, a través de cualquier medio informativo, de su opinión con respecto a pleitos pendientes o a hechos que señalen la probabilidad de casos en el futuro. *Id.* en las págs. 509-10 (citas omitidas).

De lo anterior, es innegable colegir que el énfasis primordial del Canon 14, según interpretado por este Tribunal, es procurar la sana administración de la justicia y velar por la imparcialidad de los procesos judiciales. Ello, además, constituye un interés primordial para el País. Sin embargo, tal apreciación soslaya el

derecho fundamental de los abogados a expresarse libremente, aun cuando el ejercicio de este derecho esté sujeto a límites particulares en virtud del rol que esos profesionales desempeñan. Es decir, al analizar el alcance normativo del Canon 14 es preciso no perder de vista que éste no puede utilizarse como un mecanismo para conculcar los derechos constitucionales de la clase togada indebidamente. Además, el énfasis en el adecuado funcionamiento de nuestro sistema de justicia no atiende la tensión que subyace la totalidad del Canon 14, tal y como la articuláramos en el segundo acápite de esta opinión.

Posteriormente, este Tribunal aludió al Canon 14 en sólo dos ocasiones. Véase *In re Nogueras Cartagena*, 150 D.P.R. 667 (2000); *In re Sánchez Ramos*, 174 D.P.R. 453 (2008). En ambas ocasiones, empero, el asunto estuvo atravesado, nuevamente, por cuestiones atinentes a la doctrina de separación de poderes.

En *In re Nogueras Cartagena*, se trató de expresiones hechas por un abogado mientras se desempeñaba como vicepresidente del Senado de Puerto Rico. Las expresiones se relacionaban con un pleito que se ventilaba ante los tribunales del País y en el cual el licenciado Nogueras Cartagena había intervenido como representante legal de algunos de los co-demandantes. En los méritos, este Tribunal determinó que el licenciado Nogueras Cartagena no había transgredido los deberes éticos impuestos por el Canon 14. No obstante, este Tribunal censuró enérgicamente

al licenciado Nogueras Cartagena, pero al amparo del Canon 38 de Ética Profesional, puesto que también se alegó -y probó- que el licenciado Nogueras había incurrido en conducta reprochable, según lo dispuesto por ese canon. *In re Nogueras Cartagena*, 150 D.P.R. en la pág. 681. Sobre las complejidades inherentes al Canon 14 y las tensiones que hemos identificado en las normas que contiene, nada se dijo.

En *In re Sánchez Ramos*, de otra parte, la controversia giraba en torno a unas expresiones vertidas públicamente por el entonces Secretario de Justicia, Lcdo. Roberto Sánchez Ramos, con relación a una decisión judicial, mediante la cual se determinó "no causa para arresto" ante una denuncia presentada contra el ex-gobernador de Puerto Rico, Dr. Pedro Rosselló González. Mediante dichas expresiones, el Secretario de Justicia cuestionó la imparcialidad de la determinación judicial y atribuyó ésta a las presuntas "conexiones" e "influencias" del doctor Rosselló González. Este Tribunal, al atender el asunto, una vez más, enmarcó la alegada infracción ética en la doctrina de separación de poderes, por tratarse de un funcionario de la Rama Ejecutiva. Así, al amparo de la doctrina reconocida en *In re Secretario de Justicia*, 118 D.P.R. en la pág. 850, este Tribunal se abstuvo de ejercer sus prerrogativas disciplinarias.

Es preciso señalar que, en esa ocasión, el licenciado Sánchez Ramos, al defenderse de la querella en su contra, invocó oportunamente su derecho a la libre expresión,

tutelado tanto por la Constitución federal como por la puertorriqueña. Sin embargo, no hubo que atender en los méritos dicho planteamiento constitucional, dado que la doctrina reconocida en *In re Secretario de Justicia* disponía, sin más, del asunto. Nótese, sin embargo, que las expresiones vertidas públicamente por el licenciado Sánchez Ramos —mientras fungía como Secretario de Justicia— estaban dirigidas a criticar la gestión judicial en un proceso criminal que, para todos los efectos, había concluido.[7] Las circunstancias de aquel caso difieren sustancialmente del que nos ocupa, toda vez que en esta ocasión estamos ante expresiones que meramente se relacionan con un pleito civil que, al momento de hacerse, no había concluido del todo. No obstante, conviene aludir al caso en cuestión, puesto que, en su opinión concurrente y disidente, el entonces Juez Asociado señor Rebollo López entendió que la controversia ameritaba resolverse en los méritos y, por ende, atendió los reclamos constitucionales esbozados por el querellado. *In re Sánchez Ramos*, 174 D.P.R. en las págs. 470-502 (Rebollo López, J., Opinión

---

[7] Dado que las expresiones hechas por el licenciado Sánchez Ramos versaban sobre las actuaciones de los tribunales del País, a éste se le imputó haber infringido los Cánones 9 (el cual consagra determinados deberes del abogado para con los tribunales) y 38 (que prohíbe hasta la apariencia de conducta impropia) de Ética Profesional. *In re Sánchez Ramos*, 174 D.P.R. en la pág. 472. O sea, no se le imputaron infracciones al Canon 14, puesto que las circunstancias no lo ameritaban. En consecuencia, al invocar oportunamente sus derechos constitucionales, el licenciado Sánchez Ramos impugnó la constitucionalidad de tales cánones, tanto de su faz como en su aplicación. *Id.* en la pág. 474.

Concurrente y Disidente). En lo pertinente, dicha opinión concurrente y disidente constituye la primera y única vez que este Tribunal -a través de uno de sus miembros- ha abordado lo resuelto por el Tribunal Supremo federal en *Gentile*, que, como veremos, es de cardinal importancia para la controversia que nos compete. Ello, dado que *Gentile* versa sobre el ámbito de libertad de expresión que ha de tener un abogado cuando éste se expresa sobre un pleito judicial pendiente. Por ende, conviene analizar la impronta doctrinal de *Gentile* con tal de sentar las bases desde las cuales habrá que examinar la interpretación de nuestro Canon 14, según consagrada en el segundo acápite de esta opinión.

**V**

En *Gentile*, el Tribunal Supremo federal se enfrentó a la Regla 177 de conducta profesional del Tribunal Supremo de Nevada, que, en aquel momento, regulaba la publicidad sobre juicios pendientes en dicho estado.[8] Así, en *Gentile*,

---

[8] La Regla 177 disponía:

> [1] A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding; however, a lawyer may make a statement if the lawyer has a good faith belief, based upon the totality of facts and circumstances known to the lawyer at the time, that the content of the statement is admissible at a subsequent hearing or trial or properly arguable from anticipated evidence; and

una mayoría de ese Tribunal federal determinó que la Regla 177, *según interpretada por el Tribunal Supremo de Nevada*, era inconstitucionalmente vaga.[9] En particular, se determinó que la disposición de la regla referente a las expresiones que podía hacer un abogado sin temor a ser disciplinado no proveía un aviso claro sobre la conducta permitida y, por consiguiente, tampoco proveía un aviso claro sobre la conducta prohibida.

La Regla 177, en esencia, le permitía al abogado expresarse, en forma general, sobre la naturaleza del pleito en el que intervenía, siempre y cuando procurara no abundar sobre particulares.[10] El Tribunal Supremo federal,

---

> (a) The statement protects the public from substantial future harm; or
> (b) The statement is one that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of publicity not initiated by the lawyer or the lawyer's client and is limited to such information as is necessary to mitigate the adverse publicity; or
> (c) The statement reveals governmental corruption or abuse of power.

Nevada Rules of Professional Conduct, R. 177, disponible en https://www.law.cornell.edu/ethics/nv/code/NV_CODE.HTM (derogada el 1 de mayo de 2006, y reemplazada por la actual Regla 3.6).

[9] La mayoría para efectos de este resultado se expresó a través del tercer acápite de la opinión del Juez Asociado Kennedy, a quien se le unieron los Jueces Asociados Marshall, Blackmun, Stevens y la Jueza Asociada O'Connor.

[10] Véase Nevada Supreme Court Rule 177(3)(a), Nv. St. S. Ct. R.P.C. 177(3)(a) ("Notwithstanding subsection 1 and 2(a-f), a lawyer involved in the investigation or litigation of a matter may state without elaboration: (a) the general nature of the claim or defense . . . .") (abrogada el 1 de mayo de 2006, y reemplazada por la actual Regla 3.6).

al explicar   por qué la referida regla adolecía de vaguedad, hizo hincapié en la utilización de los términos "general" y "abundar" o "elaborar", señalando que éstos no eran susceptibles de ser interpretados uniforme y consistentemente por un abogado razonable. De esta forma, pues, un abogado no sabría con certeza qué tipo de expresión estaba prohibida y cuál no. *Gentile*, 501 U.S. en las págs. 1048-1049. En consecuencia, y en lo pertinente, el Tribunal Supremo federal, por voz del Juez Asociado Kennedy, expresó que

> The right to explain the "general" nature of the defense without "elaboration" provides insufficient guidance because "general" and "elaboration" are both classic terms of degree. In the context before us, these terms have no settled usage or tradition of interpretation in law. The lawyer has no principle for determining when his remarks pass from the safe harbor of the general to the forbidden sea of the elaborated.

*Id.*

De otra parte, *una mayoría distinta* del Tribunal Supremo federal en *Gentile* –esta vez mediante la voz del Juez Presidente Rehnquist– puntualizó que los abogados, a diferencia de cualquier otro ciudadano común, están sujetos a restricciones éticas que bien pueden incidir en el ámbito de su libertad de expresión, cuando ésta ataña casos que se ventilan en los tribunales. Los abogados, en tanto funcionarios del tribunal, son instrumentos de la justicia, con lo cual no pueden, con sus expresiones, socavar la justicia misma a la que sirven. Véase *Nebraska*

*Press Assn. v. Stuart*, 427 U.S. 539, 601 n. 27 (1976) (Brennan, J., Op. Concurrente) ("As officers of the court, court personnel and attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice.") (citado con aprobación en *Gentile*, 501 U.S. en la pág. 1074 (Renhquist, J., Opinión)). Esto es, existen consideraciones que trascienden y limitan la libertad de expresión de los abogados y que están íntimamente relacionadas con la función social que éstos ejercen en pos de la justicia.

De otra parte, se señaló que, dado el acceso especial que tienen los abogados a determinada información, sus expresiones extrajudiciales tienden a percibirse como informadas, fidedignas y ciertas, lo que les impone un deber mayor de circunspección al momento de expresarse públicamente sobre casos pendientes en los que intervienen. Asimismo, esta limitación evita que se afecte perniciosamente la sana administración de la justicia y los derechos de un acusado o una parte. En ambos casos, es indudable que el Estado y la ciudadanía tienen un interés legítimo en que así sea.

En resumidas cuentas, *Gentile* establece que *se pueden restringir las expresiones de un abogado que tengan una "probabilidad considerable de perjudicar sustancialmente"*

*un proceso adjudicativo, nada más.*[11] Ese fue el estándar

adoptado por la Regla 177 de Nevada, el cual, sin embargo,

fue *interpretado inconstitucionalmente* por el máximo foro

judicial de ese Estado. *Gentile*, pues, valida el estándar

que establecía dicha regla, pero en ningún momento la

mayoría del Tribunal Supremo federal resuelve

taxativamente que ese estándar ha de ser el mínimo

aceptable constitucionalmente.[12] Más bien, el Tribunal

---

[11] Hemos optado por traducir el estándar de "*substantial likelihood of materially prejudicing*", validado en *Gentile*, como "probabilidad considerable de perjudicar sustancialmente", por entender que la traducción literal de aquél podría no reflejar con precisión el significado del mismo. Nótese, por ejemplo, que "material", en la lengua española, no coincide semánticamente con el adverbio "materially", en tanto éste significa "in a noticeable or important way", Oxford Learner's Dictionary, "materially", http://www.oxfordlearnersdictionaries.com/us/definitio n/englien/materially?q=materially. Por consiguiente, al traducir el estándar en cuestión, se prefirió utilizar, en español, por su mayor coincidencia semántica, "sustancialmente" para traducir "materially" y "considerable", dada su significación análoga, para "substantial".

[12] La Juez Asociada O'Connor, quien proveyó el quinto voto para ambos segmentos de la opinión de la mayoría, emitió un voto concurrente en *Gentile* que parece indicar una inclinación a restringir aún más la expresión de los abogados sobre pleitos pendientes. *Gentile*, 501 U.S. en las págs. 1081-82 ("I agree with much of the Chief Justice's opinion. In particular, I agree that a State may regulate speech by lawyers representing clients in pending cases more readily than it may regulate the press. *Lawyers are officers of the court and, as such, may legitimately be subject to ethical precepts that keep them from engaging in what otherwise might be constitutionally protected speech. . . . .* I agree with the Chief Justice that the 'substantial likelihood of material prejudice' standard articulated in Rule 177 *passes* constitutional muster.") (énfasis suplido). Véase, además, Scott Croft H., *Free Speech & Fair Trials-Striking the Balance: A Case Comment and Analysis of the Maryland Trial Publicity Rule as Applied in* Attorney Grievance Commission of Maryland v. Douglas F. Gansler, 19 Geo.

Supremo federal examinó la interpretación que del estándar en cuestión hizo el foro estatal y determinó que ésta era vaga. *Gentile*, 501 U.S. en la pág. 1034 ("The matter before us does not call into question the constitutionality of other States' prohibitions upon an attorney's speech that will have a 'substantial likelihood of materially prejudicing an adjudicative proceeding,' but is limited to Nevada's interpretation of that standard.). Empero, al analizar la Regla 177, el Tribunal Supremo federal da las pistas que han de guiar la labor de los tribunales al evaluar estándares distintos que pretendan establecer un ámbito de prohibición más abarcador. Cabe entonces la posibilidad de que existan –y sean constitucionalmente válidas- reglas de conducta profesional tanto más rigurosas. En otras palabras, el estándar de "probabilidad considerable de perjudicar sustancialmente" pasa el crisol constitucional, pero no es el único válido o posible.

En cualquier caso, según interpretamos lo resuelto por el máximo foro federal, aun cuando se utilice otro estándar, lo indispensable ha de ser que la prohibición relativa a la libertad de expresión de los abogados (1) no adolezca de vaguedad y/o amplitud excesiva –lo cual es imperativo constitucional insoslayable en materia de

---

J. L. Ethics 345, 351 (2006) ("The breadth of O'Connor's framing of potential limits on lawyer speech, however, seems to indicate a potential willingness to circumscribe that speech even further than the 'substantial likelihood' standard suggests.").

libertad de expresión- y (2) que tal prohibición esté estrechamente relacionada con intereses trascendentales que informan la profesión legal y que el Estado legítimamente pretende vindicar, entre otros: procurar que los procedimientos judiciales sean imparciales y velar por la sana administración de la justicia.[13] Además, la prohibición o restricción de que se trate ha de ceñirse a determinado procedimiento adjudicativo en curso. Así, no cabe hablar de limitaciones justificadas por sí mismas; por tanto, toda limitación que ataña la libertad de expresión de un abogado sobre un procedimiento adjudicativo pendiente debe relacionarse indefectiblemente con las particularidades de éste.

Coligiéndose lo anterior de lo resuelto en *Gentile*, ello constituye, a lo sumo, el mínimo irreductible que estamos obligados a respetar, en virtud de la cláusula de supremacía de la Constitución federal. Entiéndase, en virtud de la doctrina del ámbito mínimo federal no estamos obligados a adoptar, tal cual, el estándar de "probabilidad considerable de perjuicio sustancial"; más bien, lo indispensable es que al adoptar un estándar distinto conciliemos adecuadamente, por un lado, los intereses legítimos del Estado, en este caso, en la sana administración de la justicia y, por otro, la libertad de expresión de los abogados.

---

[13] Valga señalar que cabría pensar en otros intereses que bien podrían permitir limitaciones distintas – sujetas a otros estándares- en diferentes contextos, como, por ejemplo, el publicitario. Ello, sin embargo, no es pertinente a la controversia que nos atañe.

Habiendo precisado las pautas normativas, de índole constitucional, que han de guiar nuestra labor adjudicativa, procede evaluar la constitucionalidad del Canon 14 a la luz de lo anterior.

## VI

Como se sabe, cuando se examinan estatutos que limitan o interfieren con la libertad de expresión, en atención al contenido de ésta, a menudo se invocan las doctrinas de amplitud excesiva y vaguedad. Véase *Pueblo v. Hernández Colón*, 118 D.P.R. 891 (1987); véase, además, Dora Nevares Muñiz, *Derecho Penal Puertorriqueño: Parte general* 75-76, 114-17 (5ta ed. 2005). Éstas, en esencia, constituyen técnicas interpretativas que le permiten a los tribunales "evad[ir] resolver la validez de ciertas restricciones de[] contenido de . . . expresión". José Julián Álvarez González, *Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos* 1061 (2010). Ello, puesto que la determinación de amplitud excesiva o vaguedad remite a un examen formal del estatuto o regulación que se cuestiona, sin entrar a dirimir el contenido de la expresión, esto es, la protección que amerita ésta. Así, en aras de atender el planteamiento del querellado en torno a la inconstitucionalidad del Canon 14, en función de la discusión normativa que precede, conviene deslindar dichas doctrinas.

**A**

La doctrina de amplitud excesiva da cuenta de aquellos casos en que determinada reglamentación "aspira [] prohibir o castigar expresiones que no gozan de la protección constitucional[,] pero que[,] por razón de haber sido redactada o interpretada imprecisamente[,] tiene el efecto de prohibir o castigar expresiones constitucionalmente protegidas". *Muñiz v. Admdor. Deporte Hípico*, 156 D.P.R. 18, 34 (2002) (Hernández Denton, J. Op. Concurrente). Véase, también, Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law. Substance and Procedure* 42, T. V (5ta ed. 2013). En otras palabras, esta doctrina "permite que se invalide [de su faz] una norma de conducta dirigida contra la expresión por abarcar lenguaje constitucionalmente protegido, a pesar de que la expresión en el caso en que esa norma se aplica no sea protegida". Álvarez González, *supra*, pág. 1061. Por tanto, un ataque bajo esta doctrina supone examinar formalmente el texto de una regulación con tal de determinar si éste prohíbe -conjuntamente con la expresión que puede legítimamente regularse- una cantidad considerable de expresión constitucionalmente protegida. Se ha de determinar si la amplitud de la que adolece la regulación de su faz es, en efecto, sustancial.[14]

---

[14] Sobre el requisito de *amplitud sustancial*, véase, por ejemplo, *Broadrick v. Oklahoma*, 413 U.S. 601, 615-16 (1973). Véase, también, Álvarez González, *supra*, pág. 1061; Erwin Chemerinsky, *Constitutional Law. Principles and Policies* 944 (3ra ed. 2006) ("[T]he requirement for substantial overbreadth applies in all cases, whether the law regulates conduct that communicates or 'pure speech.'") (citando a *Board of*

De otra parte, la aplicación de la doctrina de amplitud excesiva supone una excepción a las normas ordinarias de legitimación activa que rigen la adjudicación constitucional. Véase, por ejemplo, *Broadrick v. Oklahoma*, 413 U.S. 601, 612-14 (1973). Esto es, "bajo la doctrina de amplitud excesiva un litigante cuya actividad no está protegida puede invocar los derechos de terceros cuya actividad estaría protegida", aun cuando éstos no formen parte de la controversia que pende ante el foro judicial. Álvarez González, *supra*, pág. 1068. Véase, además, Erwin Chemerinsky, *Constitutional Law. Principles and Policies* 943-44 (3ra ed. 2006). En consideración de lo anterior, este Tribunal ha dicho que esta doctrina ha de ser utilizada excepcionalmente y como último recurso en "*aquellos casos en donde una interpretación limitada o una invalidación parcial del estatuto no excluyan la amenaza sobre las expresiones constitucionalmente protegidas*". *Pueblo v. García Colón I*, 182 D.P.R. 129, 150-51 (2011).[15]

*En lo que respecta a la metodología que debe utilizarse al examinar determinada reglamentación en función de esta doctrina, el primer paso es interpretar la*

---

*Airport Commrs. of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987); *City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984)).

[15] Sobra la posibilidad de invalidar parcialmente un estatuto con tal de evitar la invalidación facial, véase, en general, *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985). Véase, también, Chemerinsky, *supra*, pág. 948 ("The Court also avoids the 'strong medicine' of overbreadth by attempting to sever the unconstitutionally overbroad part of the law from the remainder of the statute.").

*reglamentación impugnada.*[16] *García Colón I, 182 D.P.R. en la pág. 204; U.S. v. Stevens, 559 U.S. 460, 474 (2010). Para ello, además, será preciso tomar en consideración las interpretaciones autorizadas anteriores de la reglamentación de la que se trate.*[17] *García Colón, 182 D.P.R. en la pág. 204. Luego, procede determinar si la reglamentación, según interpretada, resulta ser excesivamente amplia, en la medida en que prohíbe una cantidad sustancial de expresión constitucionalmente protegida. Id. en las págs. 204-05. De ser ese el caso, habrá que examinar la posibilidad de suscribir una interpretación razonable que pueda subsanar los vicios constitucionales, entiéndase, la redacción deficiente. Id. en la pág. 205.*

**B**

La doctrina de vaguedad, por su parte, pretende evitar que se limite o prohíba determinada expresión sin que haya guías y normas claras y precisas para ello. En cierta medida, pues, esta doctrina es "un presupuesto del debido proceso de ley que prohíbe que se aplique contra una persona una norma cuyos términos no revelan adecuadamente qué se persigue prohibir". Álvarez González,

---

[16] Véase, *supra*, acápite II de esta Opinión.
[17] Tal y como se discutió anteriormente, el Canon 14 de Ética Profesional apenas ha sido interpretado, razón por la cual no contamos con el beneficio de un acervo interpretativo que nos asista en la delimitación de su ámbito normativo. No obstante, véase, *supra*, el acápite III de esta Opinión, para una exposición de la exigua jurisprudencia de este Tribunal sobre el particular.

*supra*, pág. 1061. Por consiguiente, esta doctrina opera cuando

> (1) la disposición legal falla en proveerle a un ciudadano de inteligencia promedio un aviso suficiente de las conductas que proscribe y penaliza, y (2) el estatuto no le provee a los funcionarios encargados de ponerla en vigor unas guías razonables, de forma tal que se preste para una aplicación arbitraria y discriminatoria interfiriendo así con los derechos fundamentales garantizados por la Constitución.

*García Colón I*, 182 D.P.R. en la pág. 149 (citando a *Boys and Girls Club v. Srio. de Hacienda*, 179 D.P.R. 746 (2010); *Pueblo v. APS Healthcare of P.R.*, 175 D.P.R. 368, 378 (2009); *Pacheco Fraticelli v. Cintrón Antonsanti*, 122 D.P.R. 229, 239-240 (1988); *Vives Vázquez v. Tribunal Superior*, 101 D.P.R. 139, 145-146 (1973)).

De lo anterior, conviene enfatizar que la determinación de vaguedad se hace en función de un estándar objetivo, a saber: si una persona de inteligencia promedio queda debidamente advertida de la expresión que la regulación prohíbe. Véase, por ejemplo, *U.N.T.S. v. Srio. de Salud*, 133 D.P.R. 153, 161 (1993); *Velásquez Pagán v. A.M.A.*, 131 D.P.R. 568, 577 (1992); *Vives Vázquez v. Tribunal Superior*, 101 D.P.R. 139, 145-46 (1973). Véase, además, *O.E.G. v. Cordero, Rivera*, 154 D.P.R. 827 (2001); *Grayned v. City of Rockford*, 408 U.S. 104, 108-14 (1972); *Cameron v. Johnson*, 390 U.S. 611, 616 (1968). Sin embargo, en tanto la controversia que nos ocupa atañe expresiones hechas por un abogado en su carácter profesional, dicho estándar objetivo ha de ajustarse en función de las circunstancias particulares que informan el

ejercicio de la abogacía. Es decir, en este caso, se trata de si *un abogado promedio queda debidamente advertido de la expresión que el Canon 14 prohíbe.*

## C

Por último, es menester señalar que, al amparo de ambas doctrinas, los tribunales están facultados para mitigar la vaguedad o amplitud excesiva de determinado estatuto a través de su labor interpretativa. Claro está, siempre y cuando dicha vaguedad o amplitud excesiva sea subsanable mediante una interpretación razonable que se ajuste, además, a los parámetros constitucionales aplicables. Ello, puesto que bien podría suscitarse el caso en que la vaguedad o la amplitud excesiva de la que adolece determinada reglamentación no puedan ser subsanadas mediante interpretación judicial. En estos casos, entonces, procedería decretar la invalidación facial de la reglamentación en cuestión.[18]

## VII

Habiendo repasado someramente las doctrinas de amplitud excesiva y vaguedad, las cuales permiten que se

---

[18] Aun cuando en otros contextos cabría distinguir entre los efectos de la aplicación de una doctrina u otra, este Tribunal ha permitido la impugnación facial al amparo de ambas. Véase, por ejemplo, *Pueblo v. García Colón I*, 182 D.P.R. 129, 149 (2011); *U.N.T.S. v. Srio. de Salud*, 133 D.P.R. 153, 160 (1993). Véase, también, *Kolender v. Lawson*, 461 U.S. 352 (1983); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982); *Young v. American Mini Theaters,* 427 U.S. 50 (1976). Para una discusión respecto a las particularidades de estas doctrinas en el ámbito del derecho a la libertad de expresión, véase Álvarez González, *supra*, pág. 1068.

cuestione    la    constitucionalidad    de    estatutos    o

reglamentación  que  pretendan  limitar  el  derecho  a  la

libertad  de  expresión,  procede  evaluar  el  Canon  14.  Para

ello,  sin  embargo,  conviene  seccionar  las  diversas  normas[19]

que  contiene  dicho  canon,  aun  cuando  todas  éstas  giren  en

torno  al  asunto  de  la  publicidad  de  procedimientos

adjudicativos  pendientes.  Así,  procederemos  a  evaluar  cada

norma  del  canon  en  cuestión  por  separado,  aplicando,  según

proceda,  la  doctrina  de  vaguedad  o  la  doctrina  de  amplitud

excesiva.[20]

**A**

La  primera  oración  del  Canon  14  establece  que  el

abogado  deberá  abstenerse  de  publicar,  o  de  cualquier

manera  facilitar,  la  publicación  -a  través  de  medios  de

---

[19] Cabe recordar que las "diversas normas" que contiene el  Canon  14  fueron  debidamente  identificadas  e interpretadas en el segundo acápite de esta opinión. En  esencia,  éstas  son:  (1)  el  deber  de  abstención  que consagra  la  primera  oración  del  canon;  (2)  la prohibición de expresiones anónimas que contiene la segunda  oración,  y,  en  la  tercera  oración,  (3)  la limitación  que  dispone  que  las  referencias unilaterales  o  *ex  parte*  han  de  ceñirse  a  las constancias de los récords y documentos archivados en los tribunales, y (4) la exhortación a abstenerse aun en  éstos  casos.  Aunque  ciertamente  estas  normas  están íntimamente  relacionadas  entre  sí,  no  es  menos  cierto que  son  distinguibles.  Formular  tales  distinciones, además,  facilita  el  análisis  constitucional,  puesto que permite evaluar a cabalidad cada aspecto normativo del canon.

[20] Nótese que "[e]stas doctrinas a menudo aplican a una misma  situación  .  .  .".  Álvarez  González,  *supra*,  pág. 1061.  Véase,  también,  John  E.  Nowak  &  Ronald  D. Rotunda,  *Treatise  on  Constitutional  Law*  56  (5ta  ed. 2013)  ("The  problem  of  vagueness  in  statutes regulating speech is based on the same rationale as the  overbreadth  doctrine  and  the  Supreme  Court  often speaks of them together.") (citas omitidas).

comunicación o informativos- de detalles u opiniones sobre pleitos pendientes o futuros. Como se dijo anteriormente, según los propios términos del canon, la limitación que supone dicho deber de abstención se justifica, "pues tales publicaciones pueden obstaculizar la celebración de un juicio imparcial y perjudicar la debida administración de la justicia". 4 L.P.R.A. Ap. IX, C. 14. Es decir, la limitación a la libertad de expresión que supone esta primera norma del canon está debidamente justificada en función de los intereses trascendentales que informan la labor del abogado, en tanto oficial de los tribunales, a saber: la imparcialidad de los procesos y la sana administración de la justicia. Así, el deber de abstención al que se refiere el Canon 14 sólo aplica cuando un abogado emite expresiones relacionadas con un procedimiento adjudicativo en el que interviene. En esos casos, el abogado deberá velar por que las expresiones que emita no menoscaben los intereses trascendentales que justifican la regulación que consagra el canon. De esta forma, pues, se subsana la posible amplitud excesiva del canon, puesto que éste, según interpretado por este Tribunal, sólo aplica a los casos en que un abogado se expresa sobre un pleito en el que interviene.

Sin embargo, es menester señalar que dado que la interpretación anterior no provee criterios específicos que permitan que un *abogado promedio* pueda colegir qué tipo de expresión, en efecto, está prohibida por razón de que pueda obstaculizar la celebración de un juicio

imparcial o perjudicar la administración de la justicia, es imperativo que este Tribunal subsane la vaguedad manifiesta del Canon 14. *Por consiguiente, lo razonable sería colegir que un abogado que esté participando, o haya participado, en la investigación o litigación de un pleito o proceso adjudicativo, no deberá hacer una manifestación extrajudicial que sepa, o deba saber, que será difundida a través de los medios de comunicación y que pueda, o haya podido, perjudicar sustancialmente el pleito o proceso adjudicativo en curso en el que interviene, o intervino.* Valga destacar, también, que, en lo pertinente, la limitación del canon es de carácter temporal. Es decir, aplica sólo mientras el pleito o proceso adjudicativo esté pendiente.[21] Una vez termine éste, la prohibición cesa. De otra parte, deberá entenderse que un pleito o proceso adjudicativo culmina cuando se emite una determinación final en cualquiera de éstos, la cual dirime la controversia sobre la que verse la expresión del abogado.[22]

---

[21] No obstante, es menester señalar que el Canon 14 dispone que el deber de abstención ha de aplicar en situaciones en que las expresiones versen sobre particulares que "señalen la probabilidad de litigios futuros". 4 L.P.R.A. Ap. IX, C. 14. Sin embargo, dados los hechos que nos ocupan, es innecesario que, en esta ocasión, este Tribunal se exprese sobre la aplicabilidad del referido deber de abstención con relación a la probabilidad de pleitos futuros.

[22] Valga señalar que, de ordinario, se entenderá que un procedimiento judicial ha culminado cuando la sentencia adviene final y firme. Sin embargo, en los casos en que un abogado haga expresiones sobre una sentencia final, mas no firme, tal circunstancia habrá de ser un factor a tomarse en consideración a la hora de evaluar si éstas —las expresiones— se ajustan a los parámetros éticos correspondientes.

Un abogado, por tanto, en aras de ajustarse a las pautas éticas que contiene el Canon 14, deberá evaluar, primero, si sus expresiones extrajudiciales serán o podrían ser difundidas públicamente y, segundo, si éstas podrían, o hubieran podido, perjudicar sustancialmente el pleito o proceso adjudicativo al que se refieren y en el cual el letrado interviene o intervino. Conviene enfatizar, además, que el perjuicio sustancial al que se refiere la norma anterior se ha de apreciar en virtud de los intereses que legitiman la prohibición de expresión que nos atañe, a saber: velar por la imparcialidad de los procedimientos y la sana administración de la justicia. De otra parte, las expresiones que se examinen bajo este estándar habrán de evaluarse en el contexto en el que fueron proferidas. Asimismo, factores tales como la reputación del cliente y el interés público de la controversia habrán de tomarse en consideración.[23] Después de todo, se trata de una formulación puntual de la responsabilidad del abogado de procurar la materialización eficiente de la justicia, si bien ajustada al contexto que nos ocupa, en el que intereses apremiantes confluyen. Por tanto, lo fundamental es determinar si *un abogado promedio*, en similares circunstancias, y atendiendo a las particularidades del pleito o proceso adjudicativo del que se trate, supo o debió saber que sus expresiones

---

[23] Por ejemplo, un abogado podrá hacer manifestaciones extrajudiciales que sean necesarias para proteger a sus clientes del efecto perjudicial causado por la publicidad reciente no iniciada por el abogado o sus clientes.

extrajudiciales podrían haber afectado la integridad del pleito o proceso adjudicativo en el que intervino.

En caso de que el abogado determinase que, en efecto, sus expresiones serán o podrían ser difundidas públicamente y que existe la posibilidad de que puedan perjudicar la integridad de un pleito o proceso adjudicativo en el que interviene, entonces se activará el deber general de abstención antes identificado, el cual constituye la primera norma dispuesta en el Canon 14, conforme la interpretación de éste suscrita por este Tribunal.

En síntesis, en virtud de lo anterior, es menester concluir que el deber general de abstención que contiene la primera oración del Canon 14 satisface el mínimo requerido que intima *Gentile.* Esto, en la medida en que dicho deber de abstención está sujeto al efecto que las expresiones hechas por el abogado puedan tener sobre la imparcialidad de un pleito o proceso adjudicativo o sobre la sana administración de la justicia; esto es, sobre la integridad de determinado pleito o proceso adjudicativo en el que el abogado interviene.

**B**

De otra parte, la segunda oración del Canon 14 establece que "[e]n caso de que las *circunstancias extremas* de un pleito específico justifiquen ofrecer una información al público, será impropio hacerlo anónimamente". Cód. Ética Profesional, 4 L.P.R.A. Ap. IX,

C. 14 (énfasis suplido). En primer lugar, dicha oración señala que las expresiones que haga un abogado podrán justificarse en atención a "circunstancias extremas", sin especificar cuáles son éstas o qué criterios podrán utilizarse para identificarlas. De su faz, pues, tal oración resulta inconstitucionalmente vaga, puesto que limita la libertad de expresión del abogado sin proveer guías y normas claras.

Sin embargo, aun pudiendo proveer criterios para identificar qué circunstancias han de reputarse como "extremas", como ya se dijo, esta limitación es, a lo sumo, excesivamente amplia ya que bien podría prohibir expresiones hechas por un abogado aun cuando éstas no afecten el pleito o procedimiento adjudicativo en el que interviene, o intervino. No se debe perder de vista que las limitaciones al ejercicio de la libertad de expresión de un abogado han de justificarse exclusivamente en virtud de los intereses apremiantes que informan y delimitan la profesión legal –por ejemplo, velar por la imparcialidad de los procedimientos y la sana administración de la justicia–. Así, no son constitucionalmente válidas limitaciones que se justifiquen en sí mismas, y que no tomen en consideración el derecho constitucional a la libertad de expresión del abogado y lo ponderen en relación con la integridad de los pleitos o procedimientos judiciales en los que éste interviene.

Por tanto, esta segunda oración del Canon 14 es inconstitucional, por ser vaga. Empero, aun pudiendo

subsanar la vaguedad señalada, la formulación de la oración en cuestión bien pudiera ser excesivamente amplia, toda vez que la prohibición que consagra no se ajusta a los intereses que precisamente legitiman cualquier prohibición a la libertad de expresión de los abogados.

Por último, la oración que nos ocupa prohíbe que el abogado emita expresiones extrajudiciales de manera anónima. Ello, a todas luces, nos parece una limitación constitucionalmente válida de la libertad de expresión del abogado, que incide, si acaso, mínimamente sobre ésta. De otra parte, obligar al abogado a identificarse cuando se exprese no perjudica injustificadamente su libertad de expresión. Más bien, esa obligación adelanta intereses de particular importancia para la sana administración de la justicia y el eficiente funcionamiento de nuestro sistema judicial, a saber: la honestidad, la transparencia y la honradez. Esto, en la medida en que el abogado que haga expresiones extrajudiciales no podrá esconderse en el anonimato y, así, evadir la posibilidad de ser sancionado disciplinariamente, si ello procediera. En consecuencia, ajustándose al deber general de abstención identificado en la primera oración del Canon 14 -y al estándar identificado que condiciona su aplicación-, el abogado, bajo ninguna circunstancia, deberá expresarse anónimamente sobre pleitos o procedimientos adjudicativos pendientes en los que intervenga.

C

Resta evaluar la tercera y última oración del Canon 14. Ésta dispone que "[u]na referencia unilateral o *ex parte* a los hechos de un caso debe limitarse a citas tomadas de los récords y documentos archivados en los tribunales . . .". 4 L.P.R.A. Ap. IX, C. 14. De otra parte, establece que aun en los casos extremos en los que presuntamente se justificaría que un abogado se exprese, "es preferible [que éste se] absten[ga] de ofrecer [] declaraciones". *Id.* Como se ha dicho, esta oración contiene, a lo sumo, dos normas distintas, si bien una de ellas, en propiedad, es una exhortación. Por un lado, se condicionan las posibles declaraciones unilaterales o *ex parte* del abogado a las constancias en los récords o archivos del caso en el que interviene, sin importar el efecto que dichas expresiones pudieren tener sobre la integridad de éste. Por otro lado, se exhorta al abogado a que, en relación con un pleito o procedimiento adjudicativo en el que interviene, o intervino, se abstenga de hacer declaraciones, aun cuando pueda estar legitimado para ello.

En cuanto a la primera porción de la oración que nos atañe, es inevitable concluir que la misma es inconstitucional, al ser excesivamente amplia. Ante todo, limitar las expresiones permitidas del abogado a citas que consten en el expediente judicial de determinado pleito o proceso adjudicativo tiene el efecto de prohibir expresión que bien pudiera estar protegida, en atención al estándar discutido en esta opinión, el cual es el presupuesto del

deber de abstención que consagra la primera oración del Canon 14. Es decir, limitar las expresiones del abogado a citas textuales de los autos del pleito o proceso adjudicativo en el que interviene, o intervino, podría incidir sobre aquellas expresiones extrajudiciales de éste que razonablemente no puedan afectar la imparcialidad de dicho pleito o proceso, o afectar la sana administración de la justicia.

De otra parte, la exhortación final de la oración es palmariamente incompatible con el deber general de abstención y el estándar establecido en el análisis precedente. Por ende, a tenor con tal análisis, la tercera oración del Canon 14 debe tenerse por no puesta.

## VIII

Vista la totalidad del expediente, y las particularidades fácticas del caso, no procede sancionar al licenciado Sueiro del Valle al amparo del Canon 14. Las expresiones extrajudiciales emitidas, públicamente, por el licenciado Sueiro del Valle se limitaron a expresar lo que había ocurrido en el foro federal y se hicieron luego de los medios de difusión se interesaran en el litigio. Además, dichas expresiones no podían razonablemente incidir sustancialmente en la imparcialidad del pleito en cuestión o afectar adversamente la sana administración de la justicia. Recuérdese, por ejemplo, que cuando el licenciado Sueiro del Valle emitió sus expresiones, el foro federal había emitido una sentencia sumaria parcial, la cual había adjudicado los pormenores sobre los que éste

se expresó. Aun cuando las palabras utilizadas por el licenciado Sueiro del Valle no hayan sido las más adecuadas, sus expresiones no contravienen la norma ética consagrada en el Canon 14. Tampoco podemos perder de vista que dichas expresiones pretendían, ante todo, proteger los intereses y la reputación de su cliente en los medios de comunicación, dado el interés que el pleito suscitó en la prensa del País. Así, procedía ordenar el archivo de la queja presentada contra el licenciado Sueiro del Valle.

## IX

Toda vez que este Tribunal no ha enmendado los Cánones de Ética Profesional, considero que no podemos cruzarnos de brazos. Es decir, nos compete atender aquellos asuntos inherentes a la regulación de la profesión legal, máxime cuando éstos inciden en el ejercicio cabal de derechos constitucionales, tutelados al amparo tanto de nuestra Constitución como de la Constitución federal. Así, por los fundamentos antes expuestos, estoy conforme con el proceder de la mayoría de este Tribunal.

Anabelle Rodríguez Rodríguez
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Roberto Sueiro Del Valle                    AB-2005-130

Voto particular de conformidad emitido por el Juez Asociado señor Martínez Torres al cual se unió la Jueza Asociada señora PABÓN CHARNECO.

En San Juan, Puerto Rico a 15 de enero de 2016.

Estoy conforme con el archivo de la queja presentada contra el Lcdo. Roberto Sueiro Del Valle.

I.

Hoy queda clara, una vez más, la urgencia de que aprobemos un nuevo Código de Ética Profesional que se ajuste a las exigencias de la profesión legal en el Siglo XXI. Resulta lamentable que debido a la dejadez de este Tribunal por décadas, algunas de nuestras normas éticas vigentes no se ajusten al estándar mínimo garantizado por la Constitución federal, según establecido por el

Tribunal Supremo federal en <u>Gentile v. State Bar of Nevada</u>, 501 US 1020 (1991).

A diferencia de otras ocasiones donde se podía responsabilizar a las otras dos ramas de gobierno porque normas arcaicas se mantuvieran vigentes por años, en este caso eso se debe única y exclusivamente a la falta de atención de este Tribunal al tema de la responsabilidad profesional de los abogados en Puerto Rico. Adviértase que nuestro poder inherente **sobre este asunto particular** veda cualquier acción de la Asamblea Legislativa y el Gobernador dirigida a la adopción de un Código de Ética Profesional que rija la abogacía y la notaría en Puerto Rico. En palabras más coloquiales, *la bola está en nuestra cancha*.

Para llevar a cabo esta reforma comprensiva de nuestro ordenamiento ético no tenemos que reinventar la rueda. Las Reglas Modelo de Conducta Profesional de la *American Bar Association* (ABA), las cuales rigen de manera uniforme en la mayoría de las jurisdicciones de Estados Unidos, incluso, en el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico, tienen que ser la ruta a seguir. Estas son producto de un grupo de trabajo compuesto por estudiosos de la materia que se encargan de revisarlas y sugerir enmiendas periódicamente para atender las nuevas necesidades y los desarrollos de la profesión legal. Además, la ABA cuenta con el *Center for Professional Responsibility*, una división permanente que se encarga, entre otras cosas, de auspiciar conferencias, publicar libros y una revista jurídica sobre el tema de responsabilidad profesional. Igualmente, brinda apoyo

a las jurisdicciones que adoptan las Reglas Modelo de Conducta Profesional de la ABA. No encuentro razón para no beneficiarnos de ese proceso, así como de todas las publicaciones y de la jurisprudencia que ya ha interpretado estas normas.[24]

En estos momentos el Secretariado de la Conferencia Judicial y Notarial se encuentra en medio de un proceso de evaluación de los comentarios presentados por la comunidad legal en reacción al Proyecto de Código de Conducta Profesional de Puerto Rico y al Proyecto de Reglas de Procedimiento para Asuntos Disciplinarios de la Abogacía y la Notaría, publicados en el 2013. Véanse In re: Extensión Términos I, 190 DPR 314 (2014); In re: Proy. Conducta Prof. y Regl. Disc., 189 DPR 1032 (2013). Confío que tan pronto recibamos el informe del Secretariado podamos adoptar, en el mayor grado posible, las Reglas Modelo de la ABA.

Por supuesto, al adoptar un cuerpo de normas como estas siempre habrá que hacerle ajustes menores para atemperarlos a nuestras necesidades. **Lo primordial es que la regla general en ese proceso tiene que ser adoptar la totalidad de las Reglas Modelo de la ABA. Descartar disposiciones particulares debe ser la excepción y solo debe proceder luego de que se ofrezca una justificación racional.** Ese proceso tampoco puede desnaturalizar la esencia y coherencia interna de las Reglas Modelo entremezclándolas con

---

[24] Para una discusión sobre la influencia de la ABA sobre la reglamentación de la conducta profesional en Puerto Rico, véase Guillermo Figueroa Prieto, Propuesta para la reglamentación de la conducta profesional en Puerto Rico, 81 Rev. Jur. UPR 1 (2012).

disposiciones provenientes de otros ordenamientos que no guardan una relación estrecha con nuestro sistema jurídico. Eso solo tiene el efecto de dar vida a un "Frankenstein" que causará más problemas que los que resuelve. Asimismo, hay que tener presente que en el Derecho, como en otras disciplinas, cada palabra es importante y cumple un propósito particular. Por eso, al momento de adoptar las Reglas Modelo hay que prestar especial atención a la traducción precisa de cada término, pues un error, o incluso, la omisión de una palabra, puede tener como efecto cambiar el significado de la norma, con las consecuencias que ello supone.

II.

En lo pertinente a este caso, la Regla Modelo 3.6 es la disposición análoga a nuestro Canon 14 de Ética Profesional. Esta Regla ha sido actualizada en varias ocasiones para ajustarse al estándar constitucional aplicable. A pesar de que ese estándar es mucho menos restrictivo que nuestro actual Canon 14, también ha sido objeto de críticas por no ser lo suficientemente flexible a la luz del derecho a la libre expresión garantizado por la Constitución federal. Véase Erwin Chemerinsky, Silence Is Not Golden: Protecting Lawyer Speech Under the First Amendment, 47 Emory L.J. 859 (1998). No obstante, a pesar de esos señalamientos, "el estándar de la Regla Modelo 3.6 ha prevalecido y ha sido adoptado, aunque con ciertas variaciones, por todas las jurisdicciones de los Estados Unidos". Celeste Hilerio Echevarría, Análisis sobre la libertad de expresión de los abogados y jueces de Puerto Rico, 83 Rev. Jur. UPR 329, 336

(2014). No me cabe duda alguna de que si ya hubiéramos adoptado el lenguaje de esta Regla Modelo, la disposición del caso que hoy nos ocupa habría sido mucho más sencilla.

III.

Por último, me preocupa el trámite interno que siguió la queja que originó este procedimiento disciplinario. Esta se presentó en el 2005 y no es hasta el 2016, más de diez años después, que disponemos finalmente de ella. **Los abogados en Puerto Rico no pueden estar sujetos a la incertidumbre que produce un procedimiento disciplinario tan extenso, máxime cuando lo que está en juego es su licencia para practicar la abogacía en la Isla.** Espero que cuando aprobemos un nuevo Código de Ética Profesional en un futuro cercano, también adoptemos las medidas necesarias para garantizar que este tipo de demora injustificada no se repita y que los procedimientos disciplinarios en este Tribunal se tramiten con mayor agilidad y eficiencia.


                              Rafael L. Martínez Torres
                                   Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re*

Roberto Sueiro del Valle                    AB-2005-130

RESOLUCIÓN
***NUNC PRO TUNC***

San Juan, Puerto Rico, a 25 de enero de 2016

Se enmienda ***nunc pro tunc*** la Resolución emitida el 15 de enero de 2016 a los fines de corregir el último párrafo para que lea como sigue:

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez emitió un Voto Particular de Conformidad al que se une el Juez Asociado señor Estrella Martínez. El Juez Asociado señor Martínez Torres emitió un Voto Particular de Conformidad al que se une la Jueza Asociada señora Pabón Charneco. La Jueza Asociada Oronoz Rodríguez inhibida.

Se corrige además, la primera página del voto particular de conformidad emitido por la Juez Asociada señora Rodríguez Rodríguez para que lea: Voto Particular de Conformidad emitido por la Juez Asociada señora Rodríguez Rodríguez al que se une el Juez Asociado señor Estrella Martínez.

Se acompaña la página con la corrección correspondiente para que sea notificada nuevamente conjuntamente con la presente. El original de la página sustituida deberá permanecer en el expediente.

    Lo  acordó  el  Tribunal  y  certifica  la  Secretaria  del
Tribunal Supremo.


                        Aida Ileana Oquendo Graulau
                        Secretaria del Tribunal Supremo